TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

_____

|   |   |   |
|---|---|---|
| OPINION | : | No. 86-502 |
| of | : | APRIL 1, 1987 |
| JOHN K. VAN DE KAMP Attorney General | : | |
| CLAYTON P. ROCHE Deputy Attorney General | : | |

_____


THE HONORABLE RICHARD J. MOORE, COUNTY COUNSEL, ALAMEDA COUNTY, has requested an opinion on the following question:

Are meetings of the Board of Directors of the Oakland-Alameda Coliseum, Inc. subject to the open meeting requirements of the Ralph M. Brown Act, Government Code section 54950 et seq.?

CONCLUSION

Meetings of the Board of Directors of the Oakland-Alameda Coliseum, Inc. are subject to the open meeting requirements of the Ralph M. Brown Act, Government Code section 54950 et seq.

1

ANALYSIS

The Ralph M. Brown Act, Government Code section 54950 et seq.[1] requires that all meetings of "legislative bodies" of "local agencies" as defined in the act shall be open and public unless excepted by the act or by some other confidentiality provision of the law. (See 54951-54953; *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41.) "Legislative body" as defined in the act is not restricted to the actual governing body of a "local agency." Also "local agency" as defined in the act may include nongovernmental bodies.

This request for our opinion posits the question whether the Board of Directors of the Oakland-Alameda Coliseum, Inc. is subject to the open meeting requirements of the Ralph M. Brown Act. The corporation is a California nonprofit corporation. Its board consists of private citizens, none of whom are appointed by any governmental officer or agency.

I.      FACTUAL BACKGROUND

The Oakland-Alameda County Coliseum, Inc. was formed in 1961 by six private citizens under the then California General Nonprofit Corporation Law. Its stated purposes were to acquire the necessary real property and to construct a multi-purpose public recreation coliseum and stadium in the City of Oakland, and to conduct the business affairs of such a complex so as to ultimately vest in the City of Oakland and the County of Alameda all the right, title and interest of the corporation in the Coliseum complex.

To effectuate these purposes the corporation entered into a master agreement with both the City of Oakland and the County of Alameda which provided in detail for the acquisition and construction of the Coliseum complex, the operation thereof by the corporation, and the ultimate transfer of the complex to the city and the county. This agreement was entered into in the latter part of 1963.

The master agreement provided that the Coliseum should be constructed and financed through the medium of a classic lease and lease-back such as have been approved in cases such as *Dean* v. *Kuchel* (1950) 35 Cal.2d 444; *City of Los Angeles* v. *Offner* (1942) 19 Cal.2d 483 and *County of Los Angeles* v. *Nesvig* (1965) 231 Cal.App.2d 603.[2]

---

[1] All section references are to the Government Code unless otherwise indicated.

[2] The lease and lease-back is commonly used to finance the construction of public facilities through the aegis of a nonprofit corporation, thus avoiding the debt limitation provisions of the

2

Accordingly, the Coliseum, Inc. agreed to acquire at its own expense the real property on which the Coliseum complex was to be constructed and to convey it (including improvements to be made thereon) to the city and county. The city and county agreed to deposit with a local bank, as trustee, the sum of $1,000,000 as the purchase price of the real property. Coliseum, Inc. further agreed to simultaneously deposit the sum of $26,000,000 with that bank, as trustee, and agreed to place the deed to the real property in escrow for delivery to the city and county. The sums so deposited were to be applied to the purchase of the Coliseum complex site and (at the direction of the corporation) to the construction costs and expenses of the complex.

In the grant from Coliseum, Inc. to the city and county of the real property, the corporation reserved in its favor a ground lease for 40 years. The corporation then executed a sublease of the land and all improvements to be built thereon to the city and county which would expire 10 days before the expiration of the ground lease. In consideration of the sublease, the city and the county agreed to pay Coliseum, Inc. $1,500,000 per year which would be utilized to retire the bonds the corporation would issue to finance construction of the Coliseum complex. The master agreement further provided that Coliseum, Inc. agreed to build and operate the Coliseum facilities.

Additionally, the city and county agreed to pay to Coliseum, Inc. the sum of $250,000 as consideration for the execution of the master agreement. They also agreed to pay the corporation the sum of $1,000,000 in consideration of the corporation's agreement to have the plans and or specifications prepared and subsequently to transfer title to these plans and specifications to the city and county, subject, however, to the corporation's use. Finally, the master agreement provided that upon the termination of the 40 year ground lease which the corporation had reserved to itself, the title to all the Coliseum facilities would vest in the city and the county.

As noted, the master agreement contained as a part thereof the actual operating agreement between Coliseum, Inc. and the City and the County. Under that "sub-agreement" the corporation agreed to operate the Coliseum facilities as an independent contractor and pay the net income from such operation to the city and the county. The operating agreement permitted and permits the corporation to adopt an annual budget, establish rules, regulations, rates and charges for the operation of the Coliseum complex. However, these matters are subject to be modified at the instance of the city and the county.

---

California Constitution applicable to the state and local governments. (See. Cal. Const., art. XVI, §§ 1, 18.). See also section 54240 et seq. *re* "public leasebacks."

It is thus seen that for some time into the future the Oakland Coliseum complex is to be operated by the Oakland-Alameda Coliseum, Inc. Its basic policy decisions will be made by that corporation's board, subject to possible change by the city and county. In short, it will not be until the year 2003 that the Oakland Coliseum complex will be both owned and operated by the city and county.[3]

## II. RESOLUTION OF THE ISSUE

As noted at the outset, the Ralph M. Brown Act is applicable to "legislative bodies" of "local agencies" as these are defined in the Act. As stated in section 54953:

"All meetings of the legislative body of a local agency shall be open and public, and all persons shall be permitted to attend any meeting of the legislative body of a local agency, except as otherwise provided in this chapter."

However as noted at the outset, a "legislative body" as defined may not necessarily be the governing body, and a "local agency" as defined may not necessarily be a governmental unit.

Before discussing the two statutory provisions upon which the resolution of the question presented depends, that is, whether the Board of Directors of The Oakland-Alameda Coliseum, Inc. is subject to section 54953, *supra*, and other provisions of the Ralph M. Brown Act, we wish to dispose of a preliminary or threshold issue. It has been suggested that the Oakland-Alameda Coliseum, Inc. as an entity meets none of the definitions of a "local agency" set forth in the act. Accordingly, or so goes the argument, since the act applies only to "legislative bodies" of "local agencies", it is immaterial that the corporation or its board of directors may literally fall within the meaning of one or more of the definitions of "legislative body" set forth in the act. Although appealing in its simplicity, we reject such suggestion since it is based upon a faulty premise. That premise is that before a particular board or commission is subject to the Ralph M. Brown Act, the entity of which *it* is a part must itself be a "local agency." However, as we will demonstrate herein, all that is necessary is that a particular board or commission or other multi-member body meets any one of the definitions of "legislative body" contained in the act. If it does, then that particular board, commission or other multi-member body

---

[3] We note parenthetically that the master agreement, including the method of financing the construction of the Oakland Coliseum complex and the operating agreement, was upheld by the courts as being in all respect "lawful and valid" in *County of Alameda, et al.*v. *Eugene Warino, as auditor of the County of Alameda, et al*., Alameda County Superior Court No. 337071.

4

will be a "legislative body" of the local agency to which it is related or "tied" by the statutory definition.[4]

For purposes of the Ralph M. Brown Act "local agency" is defined in three sections, that is, sections 54951, 54951.1, and 54951.7. For purposes of the act "legislative body" is defined in four sections, that is, sections 54952, 54952.2, 54952.3 and 54952.5.

Section 54951 sets forth what might be characterized as the general definition of "local agency." It provides:

"As used in this chapter, 'local agency' means a county, city, whether general law or chartered, city and county, town, school district, municipal corporation, district, political subdivision, or any board, commission or agency thereof, or other local public agency."

Thereafter,"local agency" is defined in sections 54951.1 and 54951.7 to include certain nonprofit corporations, neither of which would include the Oakland-Alameda Coliseum, Inc. Section 54951.1 provides:

"For the purposes of this chapter, and to the extent' not inconsistent with federal law, the term local agency' shall include all private nonprofit organizations that receive public money to be expended for public purposes pursuant to the 'Economic Opportunity Act of 1964.'"

And section 54951.7 provides:

"'Local agency' includes any nonprofit corporation, created by one or more local agencies, any one of the members of whose board of directors is appointed by such local agencies and which is formed to acquire, construct, reconstruct, maintain or operate any public work project."

As will be recalled, the Oakland-Alameda Coliseum, Inc. was formed by six private individuals. And further, no member of its board of directors is appointed by either the City of Oakland or the County of Alameda. Furthermore, it has nothing to do with the Economic Opportunity Act of 1964.

---

[4] The faulty basic premise also overlooks the real possibility that a multi-member group which meets one of the definitions of "legislative body" contained in the act may be a diverse group having no relationship to any common entity.

We now proceed to the definitions of "legislative body" for purposes of the Ralph M. Brown Act.  Initially, section 54952 sets forth what may be characterized as the general definition thereof and provides:

> "As used in this chapter, 'legislative body' means the governing board, commission, directors or body of a local agency, or any board or commission, committee, or other body on which officers of a local agency serve in their official capacity as members and which is supported in whole or in part by funds provided by such agency, whether such board, commission, committee or other body is organized and operated by such local agency or by a private corporation."

Section 54952.2 then provides a definition of "legislative body" for bodies which have been delegated authority of a local agency.  It provides:

> "As used in this chapter, 'legislative body' also means any board, commission, committee, or similar multi-member body which exercises any authority of a legislative body of a local agency delegated to it by that legislative body."

Section 54952.3 thereafter provides a definition of "legislative body" so as to include advisory bodies to a local agency.  It provides:

> "As used in this chapter 'legislative body' also includes any advisory commission, advisory committee or advisory body of a local agency, created by charter, ordinance, resolution, or by any similar formal action of a legislative body or member of a legislative body of a local agency. . . .

> "'Legislative body' as defined in this section does not include a committee composed solely of members of the governing body of a local agency which are less than a quorum of such governing body. . . ."

And finally, section 54952.5 provides a definition of "legislative body" which includes permanent boards and commissions of a local agency.  It provides:

> "As used in this chapter 'legislative body' also includes, but is not limited to, planning commissions, library boards, recreation commissions, and other permanent boards or commissions of a local agency."

It is thus seen that the fact that a nonprofit corporation is not one of the types contemplated by sections 54951.1 or 54951.7 *supra*, does not necessarily preclude

6

its inclusion within the requirements of the Ralph M. Brown Act. This is manifest from a reading of the definition of "legislative body" set forth in the general definition of section 54952 where certain boards, commissions, committees or bodies of a local agency are to be included "whether such board, commission, committee or other body is organized and operated by such local agency *or by a private corporation*." (Emphasis added.)  In short, it is seen that if the statutorily specified relationship exists between a *privately* organized or operated committee and a "local agency", that board, commission or other body will be a legislative body of *that* local agency.

This same reasoning should apply throughout.  Thus where a private board or commission meets the criteria set forth in any of the definitions of "legislative body", a sufficient connection will exist between it and the local agency to which it is "tied" so as to make it a "legislative body" of *that* local agency.  We so conclude.[5]

Having disposed of this preliminary threshold issue, we proceed to the main issue, that is, whether the Board of Directors of the Oakland-Alameda Coliseum, Inc. is subject to the Ralph M. Brown Act.  As we view the problem, the question is whether to focus upon the definition of "local agency" set forth in section 54951.7, *supra*, to resolve the issue, or whether to focus upon the definition of "legislative body" set forth in section 54952.2 to do so.

Section 54951.7, enacted in 1970 (Stats 1970, ch. 710, 1), provides that a "local agency" will include a nonprofit corporation formed 1) "to acquire, construct, reconstruct, maintain or operate any public work project" when 2) the nonprofit corporation was formed by one or more local agencies and 3) any one of its board members is appointed by such local agencies.  The Oakland-Alameda Coliseum, Inc. would meet criteria "1,"[6] but not "2" or "3."  As will be recalled, the corporation was formed by six private citizens in 1961, and none of its board is appointed either by the City of Oakland or the County of Alameda.[7]

---

[5] We would also note the futility of attempting to narrowly construe what is a "local agency" for purposes of the Ralph M. Brown Act when one observes that "any board or commission thereof" is both a "local agency" as defined in section 54951 of the act and a "legislative body" as defined in section 54952 of the act.  The Legislature itself has blurred any line one might attempt to draw between the two.

[6] . "There is no doubt that the term 'public works' means 'all fixed works constructed for public use,'. . . " .  (*Cuttino* v. *McKinley* (1933) 130 Cal.App. 136, 138.  See also *Raley* v. *California Tahoe Regional Planning Agency* (1977) 68 Cal.App.3d 965, 982-983.)

[7] One might speculate that the city and the county may have significant input as to who is appointed to the board. However, this would not vitiate the Articles of Incorporation of Oakland-Alameda Coliseum, Inc. which states:

Section 54952.2, enacted in 1981 (Stats 1981, ch. 968, § 25), defines "legislative body" to mean also "any board, commission, committee, or similar multi-member body which exercises any authority of a legislative body delegated to it by that legislative body." As will be developed at length, post, the legislative bodies of both the City of Oakland and the County of Alameda may be said to have delegated some of their powers to operate a Coliseum complex to the Oakland-Alameda Coliseum, Inc., and hence to its board of directors as its governing board.

We focus first upon section 54951.7. It has been urged that this section should govern our issue since it is the *special* provision of the Ralph M. Brown Act which specifies and hence governs which nonprofit corporations formed to construct or acquire and operate public works projects fall within the requirements of the act. This follows by application of the rule of construction that a special statute governs a more general statute which also would encompass the same subject matter, whether enacted before or after the more general statute. (See, e.g., *Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 977, fn. 8.) Accordingly, or so goes the argument, since the Oakland-Alameda Coliseum, Inc. does not fit the criteria set forth in section 54951.7, the Legislature intended to exclude it and similar nonprofit corporations from the requirements of the act.[8]

We, however, decline to follow this argument for the reason that this rule of construction, that the special provision controls the more general provision (no matter which was first enacted), requires that the two statutes be inconsistent or in conflict. (See, *e.g., People* v. *Garcia* (1986) 178 Cal.App.3d 887, 894; Code Civ. Proc. 1859). It is readily seen that there is no conflict between the language of sections 54951.7 and 54952.2. The former merely sets forth criteria for including certain nonprofit corporations within the scope of the Ralph M. Brown Act. The latter provision merely provides that certain multi-member bodies will be considered "legislative bodies." Section 54952.2 is coincidentally broad enough to include those nonprofit corporations included within the scope of 54951.7 which have been delegated powers of "legislative

---

"Except to the extent that the By-Laws may provide that any vacancy created by the resignation or removal or a director elected by the members may be filled by the vote of the members, if the office of any director becomes vacant, the remaining directors in office, by a majority vote, may appoint any qualified person to fill such vacancy. . . ."

[8] This argument also brings into play the rule of construction that "the expression of certain things in a statute necessarily involves exclusion of other things not expressed." (*Henderson* v. *Mann Theaters Corp.* (1976) 65 Cal.App.3d 397, 403.)

bodies."  In short, there is no conflict between these sections.  There is at most an overlap in these statutory provisions.

Having rejected the applicability of section 54951.7 to resolve the issue herein, we now proceed to section 54952.2, the 1981 enactment.  It is clear that both the City of Oakland and the County of Alameda would themselves have the power to operate the Coliseum complex. (See Gov. Code, § 25351 et seq.; *City of Oakland* v. *Oakland Raiders* (1982) 32 Cal.3d 60, 71.)[9]

As will be recalled, the Oakland-Alameda Coliseum, Inc. was initially formed to acquire the necessary real property for and to construct and operate the Coliseum complex in the City of Oakland.   The master agreement between the corporation and the city and county contained a "sub-agreement", that is, the "operating agreement".  Under the latter agreement the corporation agreed to operate in the status of independent contractor all the Coliseum facilities (which the corporation had initially conveyed to the city and county, and ultimately had leased back to them).  The operating agreement required and requires the corporation to pay the net income from such operation to the city and county.  It also permitted and permits the corporation to adopt an annual budget, establish rules, regulations, rates and charges for the operation of the Coliseum complex to the corporation, and hence to its board of directors.  This "operating agreement" parallels the operating agreement discussed in *County of Los Angeles* v. *Nesvig*, *supra*, 231 Cal.App.2d 603 with respect to the County Music Center.  In that case the County of Los Angeles, also through the aegis of a nonprofit corporation and a lease and lease-back, provided for the construction of the Music Center.  In that case, the county also provided that this nonprofit corporation should operate the Music Center under an "operating agreement" for 40 years.

Noting that a public body may not delegate its powers of control over public affairs, the court nonetheless held that the operating agreement was a lawful *delegation* of county functions stating:

"Clearly, the operation and management of places of public assembly is an administrative function which may be delegated . . . the issue in each case of delegation is whether ultimate control over matters involving the exercise of judgment and discretion has been retained by the public entity . . .

---

[9] Since the Coliseum complex was completed many years ago, we need not concern ourselves herein with respect to any delegation by the city and the county to acquire and construct such a complex.

".  .  . In *Haggerty* [*Haggerty* v. *City of Oakland,* 161 Cal.App.2d 407] .  .  . the lease of a convention hall and banquet building by the City of Oakland for operation by a private party was found to be a valid exercise of city power under proper controls, since under the lease the city retained the right to control the use of the premises for convention or banquet purposes and to control prices, charges, subleases, and practices of the lessee." (*Id.*, at p. 617.)

Accordingly, the board of directors of the corporation, as its governing body, have been delegated powers of the city and county to operate the Coliseum complex. Therefore, the status of the corporation and its board of directors is to be determined by section 54952.2, as added to the Ralph M. Brown Act in 1981, and not by inferences to be drawn from section 54951.7, the section added in 1970 relating specifically to nonprofit corporations formed to construct or operate public works projects.

In so concluding, we would point out that a body which has been delegated powers of a "legislative body" of a local agency pursuant to section 54952.2 will itself be a "legislative body" for purposes of the Ralph M. Brown Act only when meeting with respect to the exercise of *those* delegated powers. Such a delegation may be narrow or may be virtually all encompassing. We appear to be dealing with the latter form of delegation herein.

Conceivably, the Board of Directors of the Oakland-Alameda Coliseum, Inc. could meet for the sole purpose of discussing matters which do not fall within the scope of any delegation from the city or the county, for example, a discussion of purely corporate matters unrelated to the operation of the Coliseum complex. However, as a general proposition, it would seem that their meetings of necessity would normally relate to their delegated powers.

Accordingly, we conclude that the meetings of the Board of Directors of the Oakland-Alameda Coliseum, Inc. are subject to the open meeting requirements of the Ralph M. Brown Act.

*****

10